# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 22-0215V

| | |
|---|---|
| SHANNON MCDONALD,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: February 5, 2025 |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On February 25, 2022, Shannon McDonald filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination she received on December 30, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not resolve the appropriate amount of damages to be awarded.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the total amount of **$116,102.76,** comprised of $115,000.00 for actual pain and suffering, plus $1,102.76 in past unreimbursed medical expenses.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

### I.     Relevant Procedural History

Although Respondent conceded that Petitioner is entitled to compensation, the parties reached an impasse in their damages discussions. Petitioner filed a Brief in Support of Damages ("Br.") on February 21, 2024. ECF No. 30. Respondent filed a responsive brief ("Resp.") on April 5, 2024. ECF No. 31. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 32. That hearing was held on December 19, 2024,[3] and the case is now ripe for a written determination.

### II.    Relevant Medical History

Petitioner, a 38-year-old nurse, had a flu shot in her left arm on December 30, 2020. Ex. 1 at 3. Two weeks later, on January 13, 2021, she had a telehealth appointment with her primary care provider ("PCP") during which she reported progressively worsening pain after her flu shot. Ex. 2 at 23. The doctor noted decreased range of motion, bony tenderness, and pain. *Id*. at 24. Petitioner was advised to use warm compresses, was prescribed naproxen, and was sent for x-rays. *Id.* at 23.

The following day (January 14, 2021), Petitioner saw an orthopedist to whom she complained of two weeks of shoulder pain that "occurred immediately after getting a flu shot." Ex. 3 at 40. She described the positioning of her vaccination as "up near the subacromial space." *Id*. On exam, she had painful arc, "marked impingement signs," and pain with range of motion. *Id*. Petitioner was assessed with bursitis and given a cortisone injection. *Id*. at 41.

Petitioner began physical therapy on February 5, 2021. Ex. 4 at 18. She reported that the cortisone injection had helped her range of motion, but she continued to have pain both at rest and with activity. *Id*. Petitioner's left shoulder range of motion was limited and her strength was diminished during the exam. *Id.* at 19. She had a total of eight physical therapy sessions through April 5, 2021. *Id*. at 62. At the time of her discharge, she had met three out of six therapy goals. *Id*. at 58.

Petitioner returned to her orthopedist on March 25, 2021 reporting "some persistent pain" and a "mild setback." Ex. 3 at 30. An MRI was ordered. *Id*. Although the MRI was incomplete, there was no evidence of concerning pathology. *Id*. at 27.

---

[3] At the end of the hearing held on December 19, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

Just over two months later, on June 8, 2021, Petitioner returned to the orthopedist. Ex. 3 at 23. She reported that her shoulder pain was aggravated one week prior, after holding her 2-year-old son. *Id*. She explained that she had previously been managing her shoulder pain with a home exercise program and Mobic. *Id*. At the time, she had pain with all use of her left arm (her dominant side). *Id*. On exam, she was able to reach full range of motion, but with pain, and had pain with impingement testing. *Id*. The diagnosis was with shoulder impingement and Petitioner was given a second cortisone injection and referred back to physical therapy. *Id*. at 24. She returned a week later, on June 28, 2021 with pain so severe that she expressed that she could not continue working. Ex. 3 at 20. She was diagnosed with impingement, bursitis, and arthritis of the left shoulder. *Id*. at 22. Surgery was recommended and scheduled. *Id*.

Petitioner underwent arthroscopic surgery on July 6, 2021. Ex. 3 at 18-19. Surgery consisted of debridement of a labral tear, debridement of the rotator cuff, subacromial bursectomy, subacromial decompression and acromioplasty, and open resection of distal clavicle. *Id*.

Petitioner had post-operative follow-ups with her orthopedist on July 8, July 26, August 23, and September 27, 2021. Ex. 3 at 5, 9, 13, 16. At the final appointment, the doctor noted improvement, but still some deficits. *Id*. at 5. She was allowed to return to work as of October 4, 2021. *Id*.

Petitioner returned to physical therapy on August 5, 2021. Ex. 4 at 63. She completed twelve post-surgical physical therapy sessions through October 21, 2021. On September 8, 2021, she reported pain of 1/10 at best and 6/10 at worst, and had made some progress toward her therapy goals. *Id.* at 115. The plan of care from Petitioner's final session on October 21, 2021 noted that she had taken a six week break from therapy due to insurance issues. Ex. 3 at 7. At that time, she continued to have limitations with range of motion and additional treatment was planned. *Id*.

There are no additional treatment records.

### III. The Parties' Arguments

#### A. Petitioner

Petitioner seeks an award of $135,000.00 for her pain and suffering. Br. at 1. In her brief and argument, Petitioner highlights her significant treatment as well as her continued symptoms at the time of her last treatment, including pain up to 6/10 in intensity and limited range of motion. Br. at 6-7. Petitioner cited six prior SIRVA cases that involved injured claimants with awards ranging from $110,000.00 to $135,000.00. Br. at 4-6.

### B. Respondent

Respondent proposes a pain and suffering award of $90,000.00. Resp. at 2. He characterizes Petitioner's SIRVA as "mild to moderate," with a relatively short duration of ten months. *Id*. at 5. He further argues that some of the surgical procedures were "most likely not SIRVA-related." *Id*. Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that, generally, those petitioners had more treatment over longer periods of time. *Id*. at 6-8.

### IV.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with

4

my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### V.     Prior SIRVA Compensation Within SPU[5]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also*

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do

determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.    Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VI.   Appropriate Compensation in this Case

#### A. Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, along with all assertions made by the parties in

---

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

their written and oral arguments. I also consider prior awards for pain and suffering in SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the specific circumstances of this case.

In this case, there is no dispute of the Petitioner's awareness of her injury. The parties also generally agree on Petitioner's course of treatment, which included treatment within two weeks; prescription medications; one MRI; two cortisone injections; an arthroscopic surgery; and twenty physical therapy treatments (8 before and 12 after surgery) over a ten-month period.

Both parties have provided reasonable arguments based on prior SIRVA cases to justify their proposed awards for pain and suffering. Both relied on *Kestner v. Secretary of Health & Human Services,* No. 20-0025V, 2022 WL 2447499 (Fed. Cl. Spec. Mstr. Mar. 10, 2023), in which I awarded $115,000.00 in pain and suffering to a petitioner who had one cortisone injection, 36 physical therapy sessions, and one surgery over an eight-month period. Petitioner argues that her injury was more severe than that of the *Kestner* petitioner because she required two cortisone injections, had a longer treatment course, and suffered more severe ongoing symptoms, and that her inability to work for five months is evidence of "the debilitating nature of her pain." *Id*. at 6-7. Respondent, in contrast, argues that the *Kestner* petitioner's injury was more severe because she had "more than twice as many" physical therapy treatments, lost work, and her surgery was fully related to her SIRVA, rather than non-SIRVA pathology. Resp. at 7-8.

While Respondent makes valid points in his argument, he has not successfully established in this case the type of extraordinary circumstances that would require a downward departure as low as $90,000.00 for a SIRVA that required surgical treatment. But Petitioner's request is nevertheless somewhat high (and even higher than *Kestner*).

I find Petitioner's situation to be similar to *Issertell v. Sec'y of Health & Human Servs.*, No. 20-0099V, 2022 WL 2288247 (Fed. Cl. Spec. Mstr. May 17, 2022), in which I awarded $112,500.00 for pain and suffering. The *Issertell* petitioner sought treatment within 15 days of vaccination, had one MRI, one cortisone injection, an arthroscopic surgery, and 14 physical therapy sessions. *Id*. at *2-6. At the conclusion of her treatment, Ms. Issertell had "near normal" range of motion and was able to do all daily activities, including going to the gym. *Id*. at *6. While Petitioner experienced a similar course, her injury required somewhat more treatment than did Ms. Issertell, with two cortisone injections and 20 physical therapy sessions. Further, at the end of treatment Ms. McDonald still had pain and range of motion deficits that both her orthopedist and physical therapist believed required additional treatment. *See* Ex. 3 at 5, 7. These facts justify a slightly higher award in this case.

Therefore, based on the record as a whole and on the parties respective arguments, I find that **$115,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### B. Unreimbursed Expenses

After the hearing in this case, the parties reached an agreement that Petitioner should be awarded **$1,102.76 in past unreimbursed out-of-pocket expenses**. *See* ECF No. 38. Therefore, Petitioner is awarded said amount without adjustment.

### Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of $116,102.76, comprised of $115,000.00 for pain and suffering and $1,102.76 for past unreimbursed expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, Shannon McDonald.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.